**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION**

| | |
|---|---|
| SUSIE BRISHABER, )<br>)<br>Plaintiff, )<br>) Case No.: 4:21-cv-180<br>v. )<br>)<br>SELLERSBURG HEALTHCARE )<br>CENTER, DEMORRIS JENKINS, )<br>and LEANNE HOWE, )<br>)<br>Defendants. )<br>) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION.**

Plaintiff, by counsel, files her complaint for damages suing Defendant, Sellersburg Healthcare Center (hereinafter "Sellersburg"), Demorris Jenkins (hereinafter "Jenkins"), and Leanne Howe (hereinafter "Howe") as follows:

This action is for damages to redress Defendants Sellersburg, Jenkins, and Howe's unlawful discrimination against Plaintiff, Susie Brishaber (hereinafter "Brishaber"), based on her gender, female, and race, white, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

Brishaber sues Sellersburg, Jenkins, and Howe for violation of her rights under 42 U.S.C. § 1981 for race discrimination in her employment contract with Sellersburg.

Brishaber also brings a state tort claim of defamation against Defendants Jenkins and Howe for the intentional tort of defamation *per se*, causing harm to her professional reputation, by falsely accusing Brishaber of refusing a patient care assignment and calling in to avoid resident care.

1

Brishaber also sues Sellersburg HealthCare Center for defamation under the doctrine of *respondeat superior* as Jenkins and Howe were acting within the scope of their respective employment when they made the false allegations against Brishaber.

Plaintiff seeks all allowable damages under the law, including back pay, front pay, interest, compensatory damages, punitive damages and the costs and fees related to this litigation.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this proceeding pursuant to *42 U.S.C. §2000e-5(f)(3)* (Title VII) and 42 U.S.C. §1981.
2. In addition, jurisdiction is invoked pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 for claims involving federal law.
3. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.
4. Brishaber satisfied her statutory obligation to exhaust her administrative remedies with regard to her Title VII complaint, having timely filed a charge of race and sex discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), EEOC Charge No. 470-2021-01475, on or about February 23, 2021.
5. Brishaber received the EEOC's "Notice of Suit Rights" on August 23, 2021 and brings this lawsuit within 90 days of receiving the same.
6. All actions which form the basis of this claim originated in Clark County, Indiana.

## PARTIES

7. At all times relevant to this Complaint, Brishaber resided in Clark County, Indiana.
8. Defendant Sellersburg Healthcare Center is located in Clark County, Indiana.

9. At all times relevant to this cause of action, Defendant Sellersburg was conducting business in Clark County, Indiana.

10. Defendant Demorris Jenkins, black male, at all times relevant to this lawsuit, was an employee of Defendant Sellersburg Healthcare Center.

11. Defendant Howe, white female, at all times relevant to this lawsuit, was an employee of Defendant Sellersburg Healthcare Center.

## STATEMENT OF FACTS

12. Brishaber incorporates by reference paragraphs 1 – 11 above as if stated fully herein.

13. Brishaber is a White female.

14. Brishaber was hired in February of 2019 as a nurse and was subsequently promoted in January 2020 to Director of Staff Development and Infection Preventionist at Sellersburg.

15. Brishaber also served as Charge Nurse, staff nurse, and for several weeks served as Interim Director of Nursing ("DON").

16. On May 10, 2020, Brishaber applied for the permanent DON position but was denied the position in favor of a less qualified black male, Jenkins.

17. Ms. Katheryn "Karrie" Bailey (Bailey), District Director of Clinical Operation, (a white female, with bi-racial African American children) was in charge of hiring a DON for Sellersburg.

18. Bailey knew of Jenkins' drug problem.

19. While serving as DON at Rolling Hills Healthcare Center, another Communicare nursing home, Jenkins was found to have overdosed on drugs and was admitted to a drug rehab program.

20. Bailey was aware of Jenkins' drug problem and drug rehab admission in mid-2020.

21. Bailey was aware Jenkins was undergoing weekly drug testing at approximately the same time as the Director of Nursing position at Sellersburg Health Center was announced.

22. At the time Brishaber applied for the position of Director of Nursing, Bailey knew that Brishaber had a clean employment record and no record of drug dependency or abuse.

23. Bailey was also aware that Brishaber had a four-year Nursing degree, while Jenkins only possessed a two-year Nursing degree.

24. Despite Jenkins' recent misconduct and Brishaber being more educated in nursing, Bailey selected Jenkins, a black male instead of Brishaber, a more qualified white female.

25. Bailey transferred Jenkins to the Sellersburg facility from Rolling Hills in or around mid-July of 2020.

26. Employees at the Sellersburg facility know employees from Rolling Hills from having worked at Sellersburg and vice versa.

27. The former Rolling Hills employees also disclosed that due to Jenkins' personal drug use, he was in in-patient drug rehab during the time of his employment at Rolling Hills, just before being transferred to Sellersburg in or around July 2020.

28. Bailey was responsible for having Jenkins drug-tested weekly.

29. One week when she could not supervise Jenkins' drug testing, Bailey had to ask another nurse to supervise Jenkins' weekly drug test.

30. As Director of Staff Development, Brishaber's work schedule consisted of the day shift, 40 hours per week, Monday through Friday, and required being on call on the weekend once a month, per a rotation schedule.

31. In or around late July 2020, Jenkins constructively forced Brishaber to quit her position as Director of Staff Development by involuntarily changing her work schedule from Monday through Friday to seven days a week, forcing Brishaber to work in excess of 50-60 hours a week without additional compensation.

32. Jenkins constructively forced Brishaber to accept a less desirable and more arduous position as a night shift floor nurse in early August 2020.

33. However Jenkins directed Brishaber to continue performing double duty as Infection Preventionist. at the same pay rate, until Brishaber's replacement was hired in early September 2020.

34. In early September 2020 Jenkins hired Shirley Yuh ("Yuh"), a black female, for the Director of Staff Development and Infection Preventionist position, previously held by Brishaber.

35. Jenkins directed Brishaber to train Yuh, her replacement, which she did.

36. Jenkins did not require Shirley Yuh to work seven days a week as he had required Brishaber to do; instead, Shirley worked a regular schedule of just 40 hours a week, Monday through Friday.

37. Jenkins told Brishaber that Yuh would not be required to do on-call weekend rotations as the Director of Staff Development and Infection Preventionist, as he had made Brishaber do.

38. Brishaber had put in for vacation for October 19, 2020.

39. The state auditors were scheduled to audit Sellersburg facility on October 8, 2020.

40. Mr. Peak and Jenkins denied her vacation because they wanted her to pose as the Infection Preventionist for the Sellersburg facility.

41. Upon getting ready for the state audit, Brishaber found that her replacement, Shirley Yuh, had failed to maintain the antibiotics log and was several weeks behind.

42. Brishaber had to go behind Yuh and bring the log up to date.

43. Brishaber made Jenkins aware of Yuh's failure to maintain the antibiotic log.

44. However, Jenkins took no disciplinary action against Yuh, but instead made Brishaber perform Yuh's job.

45. Yuh had also failed to monitor the required staff annual continuing education.

46. On October 8, 2020, shortly after noon, Demorris contacted Brishaber at home and directed her to report to work.  He directed her to talk to the state auditors and pose as the Infection Preventionist for the facility.

47. Brishaber questioned Jenkins' directive and asked Jenkins why.

48. Jenkins replied that Yuh "doesn't know what she's doing".

49. Brishaber then confronted Jenkins and had him confirm to her that he was asking her to pose as the Infection Preventionist.

50. The Sellersburg facility is required by regulation to have a staff RN serve as Infection Preventionist to work as such for a minimum of twenty hours per week.

51. Brishaber did as Demorris had directed and sat for the audit, answering the auditor's questions.

52. The auditor told Brishaber that Demorris had identified her as the Infection Preventionist.

53. The auditor asked Brishaber if she worked twenty hours a week as the Infection Preventionist.

54. Brishaber was forced to lie to the auditor for fear of losing her job.

55. The auditor then asked Brishaber if she was also in charge of staff continuing education. Brishaber denied that she was and identified Yuh as the one in charge of staff continuing education.

56. When Jenkins found out that Brishaber had told the auditor that she was not the continuing education director and that Yuh was, he got very angry.

57. Shirley Yuh, the newly hired Director of Staff Development and Infection Control should have been the official to talk to the CMMS auditors since she was the Director of Staff Development and Infection Preventionist, but Jenkins allowed her to avoid that responsibility.

58. Only after Brishaber agreed to misrepresent herself as the facility employee in charge of the infection control and prevention program did Peak and Jenkins approve Brishaber's October vacation request.

59. As time progressed a pattern began to emerge under the supervision of Jenkins as DON. White employees were being terminated and replaced with less qualified black employees some of whom had no nursing credentials.

60. Jenkins also hired less qualified black employees who had pre-existing social relationships with Jenkins, some of whom were in the same inpatient drug rehabilitation facility as Jenkins.

61. From the period of July 2020 through October 2020, Jenkins hired approximately 20 new employees, of which, only two were White. The two White employees that had been hired either quit or did not report to work at all.

62. The eighteen or so black new hires replaced white employees.

63. Jenkins exempted Yuh, black female, from working overtime.

64. In or around early October 2020, one of the unit managers, white female, requested the on-call nurse be called in to work the night shift because the unit was short a nurse.

65. At the time of the unit manager's request for an on-call nurse, Yuh was the scheduled on-call nurse.

66. The unit manager called the Scheduler, Shane Thomas, and requested that the on-call nurse be called into work.

67. Thomas apparently alerted Jenkins of the unit manager's request that the on-call nurse, Yuh, be called in to work due to the staff shortage.

68. Jenkins called the unit manager and told her that Yuh was not coming in to work even though she was the on-call nurse.

69. Jenkins' failure to have Yuh report for work as the on-call nurse left the unit short-staffed.

70. On October 16, 2020, a high-risk patient at Sellersburg had sustained a fall, was detoxing from alcohol which was causing hallucinations, and was prone to violent outbursts.

71. Such patients as described above are supposed to be assigned a one-on-one attendant to protect the patient from injury; Sellersburg's practice was to assign a Certified Nursing Assistant (CNA) to serve as the one-on-one attendant.

72. As DON, Jenkins was, or should have been, aware of the facility's policy of assigning a one-on-one attendant for such patients.

73. As the sole RN on duty, Brishaber was responsible for administering the medications for the patients in her hall, colloquially known as a "med pass."

74. The "med pass" procedure is time-consuming and sometimes tedious because of the time involved in awakening the patient, raising the patient into a sitting position, ensuring the

patient has water, talking to the patient regarding the meds he/she is about to be given, ensuring the patient takes the proper dosage, ensuring the patient does not have difficulty consuming the meds, etc.

75. Each such "med pass" took approximately 3.5 – 4 hours to complete. There was a minimum of two "med passes" each night shift which Brishaber worked.

76. The patients in Brishaber's hall were rehabilitation-to-home patients, i.e., patients who were recovering from surgery and rehabbing before being sent home.

77. Such patients are prescribed a range of pain medications which typically had to be administered to them by the RN on duty, in this case, Brishaber.

78. The other staff employee, the CNA, was responsible for assisting the rehabilitation patients who required assistance bathing, showering, ambulating and answering patient "call buttons" when patients would press the bedside button for assistance.

79. Jenkins was aware of the fact that the night shift staffing for Brishaber's patient hall consisted of only Brishaber and a CNA.

80. Jenkins was also aware of the typical amount of time it took to complete each "med pass," and the patient assistant duties of the CNA.

81. Jenkins was also aware that Brishaber and the CNA worked the rehab-to-home patient hall and that those patients were more medically acute.

82. On October 16, 2020, Brishaber asked Jenkins, to assign a CNA for the night shift, to a patient who needed one-on-one monitoring because the patient had been reported as very agitated.

83. Jenkins told Brishaber that the patient did not require one-on-one and walked away.

84. Another RN spoke to Brishaber about this patient shortly after Jenkins denied Brishaber's request.

85. The RN confirmed that the patient did in fact need a one-on-one attendant.

86. Brishaber asked the RN to speak to Jenkins to reinforce the patient's need for a one-on-one, but the RN was unable to do so because Jenkins had already left the facility.

87. Brishaber looked outside for Jenkins but could not find him.

88. Brishaber then called Jenkins and it went directly to voicemail, signaling to Brishaber her call had been declined. Brishaber left a voicemail asking for a return call right away, referencing the patient that needed a one-on-one attendant.

89. When Brishaber did not hear back in a timely manner she texted Jenkins asking for clarification but did not receive a response.

90. Brishaber then called Peak, the Executive Director of Sellersburg, and reported the situation and stated that she needed guidance about what to do. Peak stated to Brishaber that this was a "Demorris (Jenkins) thing" and that he (Peak) does not make clinical decisions and directed Brishaber to again call Jenkins.

91. Brishaber called Jenkins twice more and left a voicemail.

92. Brishaber called Peak again who advised Brishaber to keep leaving messages.

93. Peak finally called Jenkins and directed him to return Brishaber's phone call.

94. Jenkins finally returned Brishaber's call and reprimanded Brishaber for calling Peak.

95. Brishaber informed Jenkins that another staff member was needed to serve as the one-on-one attendant.

96. Jenkins declined to call in an on-call CNA to serve as the one-on-one attendant and replied, "If you need to put someone on one-on-one, put them on one-on-one."

10

97. Brishaber asked Jenkins how she was supposed to do that when there was not a CNA available on her shift.

98. Jenkins was audibly annoyed with Brishaber and instead of answering her question, he informed her that she (Brishaber) should only be calling him (Jenkins) and not Peak. Jenkins then ended the phone call.

99. Only Jenkins had the authority to call an employee from the on-call duty roster in to work; the regular nursing staff such as Brishaber did not have such authority.

100. Jenkins refused to arrange for an on-call staff member to report for work to serve as a one-on-one attendant.

101. On Saturday, October 17, 2020, Brishaber called in sick in accordance with company policy.

102. On Tuesday, October 20, 2020, Howe, Human Resources Manager for Sellersburg Communicare, phoned Brishaber and notified her that she was fired from her job.

103. Howe listed the reasons for Brishaber's termination as 1) failure to carry out a "reasonable request of supervisor; 2) refusing assignment; and 3) calling in for scheduled shift to avoid resident care."

104. Jenkins was on the phone line with Howe.

105. Brishaber asked for an explanation, to which Howe described Jenkins' allegation that she had refused to assign the patient in question a one-on-one CNA.

106. Brishaber asked Jenkins to repeat what he had told her that night regarding the one-on-one situation.

107. Jenkins said, "Put the patient on a one-on-one if you need to."

108. Brishaber then asked Howe, "How is that a failure to follow a directive?"

109. To which Howe replied that it was still a failure to follow Jenkins' directive.

110. Brishaber explained to Howe that she had specifically informed Jenkins more than once that the patient required a one-on-one CNA nurse, that Jenkins had refused to call in a CNA.

111. Brishaber also explained that she had called in sick on October 17 so she couldn't have "refused an assignment," and denied that she had called in to avoid resident care.

112. Upon completing her explanation, Howe told Brishaber that she was still fired from her job.

## COUNT I.

### Title VII - Race and Sex Discrimination.

113. Brishaber incorporates by reference paragraphs 1 through 112 above as if stated fully herein.

114. Defendant Sellersburg discriminated against Brishaber based on her sex, female, and race, white, by denying her promotion to Director of Nursing in favor a less qualified black male, Demorris Jenkins.

115. It is common knowledge in the health care profession that a DON has greater control over and access to controlled narcotic drugs than regular nursing staff because of her/his authority over nursing staff, including the ability to divert such drugs for personal use or illicit sale.

116. It is also common knowledge that a nurse with a known history of recent drug abuse should not be hired as a DON.

117. Brishaber had a four-year nursing degree and no record of drug abuse.

118. Jenkins had a record of drug abuse just prior to his selection as DON which Bailey, the selecting official, was aware of.

119. Jenkins had only a two-year degree nursing degree compared to Brishaber.

120. Because of his known record of drug abuse, Jenkins was less-qualified to be DON than Brishaber.

121. Sellersburg knew at the time of selecting Jenkins that a DON has greater access and control over controlled drugs in the nursing home.

122. No responsible selecting official would select a known drug abuser over a non-drug abuser for the position of DON.

123. Sellersburg, through Jenkins, created a hostile work environment in which Brishaber worked by 1) requiring her to assume additional duties and work extra hours but not requiring the same of other black staff;  2) by forcing Brishaber to step down from her position of Director of Staff Development and Infection Preventionist so as to be able to work a normal forty-hour work week as compared to the fifty to sixty hours Jenkins was requiring of her; 3) forcing Brishaber to accept a night shift nurse position; 4) putting Brishaber in the position of risking patient health and welfare by refusing to assign a one-on-one attendant to a patient despite Brishaber's repeated requests; 5) reprimanding Brishaber for doing the right thing in requesting assistance from Jenkins' boss, Peak, after Jenkins refused to accept Brishaber's calls to him asking for a one-on-one patient attendant.

124. Brishaber complained to Peak, the acting Executive Director at least twice but Peak took no action against Jenkins to stop Jenkins' hostile environment activity.

13

125. Sellersburg, through Jenkins, discriminated against Brishaber by treating her less favorably than Yuh, black, by requiring Brishaber to perform Yuh's duties in preparation for the state audit.

126. Jenkins treated Yuh more favorably than Brishaber and other white nurses by exempting her from working more than her normal week-day schedule whereas Jenkins routinely required Brishaber and other white nurses to work many hours more than their normal forty-hour week-day schedule.

127. As explained above, Jenkins exempted Yuh from reporting to work as the on-call nurse, thereby causing Brishaber and her two white colleagues to work extra hard, putting patients' safety and health at risk because of short-staffing.

128. Sellersburg treated Brishaber less favorably based on her sex and race, white, forcing her to acquiesce to Jenkins' wrongful directive to perform Yuh's duties and but taking no action against Jenkins, black, who lied to the state auditor saying that Brishaber was Sellersburg's Infection Preventionist when in fact she was not.

129. Defendant Sellersburg has intentionally discriminated against Brishaber based on her sex and race, white, in violation of Title VII.

## COUNT II.

### Section 1981 - Race Discrimination.

130. Brishaber incorporates by reference paragraphs 1 through 129 above as if stated fully herein.

131. Defendant Jenkins, black male, lodged three false allegations against Brishaber.

132. Sellersburg, Howe, and Jenkins also violated Sellersburg's policy of progressive discipline by skipping the verbal warning and written warning steps of the company's progressive discipline policy.

133. Even though Brishaber had committed no offenses, in order to make it appear that Brishaber had violated a number of policies, all three Defendants "stacked" two false allegations against Brishaber, accusing her of refusing an assignment and calling in to avoid patient care, even though there was only one incident of absence, Brishaber's calling in sick on October 17, 2020.

134. Brishaber had notified Jenkins before he left work that he needed to assign a one-on-one attendant for that night's shift because a patient was detoxing and hallucinating and was likely to injure himself without a one-on-one attendant.

135. Jenkins denied Brishaber's request, telling her that the patient did not need a one-on-one attendant.

136. Later that evening, a couple of hours after Jenkins had left, Brishaber attempted to contact Jenkins three times, each time Jenkins would not contact Brishaber.

137. As DON, it was his duty to return the call of a shift nurse.

138. Only after Brishaber called Peak, Jenkins' boss, did Jenkins call Brishaber back.

139. Jenkins scolded Brishaber for having called his boss. In the ensuing conversation, Jenkins told Brishaber to go ahead and assign a staff member to one-on-one attendant duty if she needed to.

140. However, Jenkins refused to call-in a CNA from the on-call list to report to work as a one-on-one attendant.

141.    Jenkins set up Brishaber for possible failure by, on the one hand, refusing to provide a needed one-on-one attendant, and on the other hand, telling Brishaber to assign a CNA to one-on-one duty if needed.

142.    Jenkins committed a more serious patient-care offense by refusing to call-in a CNA to serve as a one-on-one attendant, placing the patient at risk of injury, compared to Brishaber who called in sick.

143.    Sellersburg, Howe, and Jenkins discriminated against Brishaber based on her race, white, by contriving false reasons to fire her, in violation of Section 1981 of the Civil Rights Act of 1866.

144.    Brishaber seeks all damages permitted under §1981, including back pay, front pay, compensatory damages, and punitive damages, as well as reasonable legal fees against all Defendants.

## COUNT III.

### Defamation *Per Se* (Demorris Jenkins)

145.    Brishaber incorporates by reference paragraphs 1 through 144 above as if stated fully herein.

146.    On October 20, 2020, Defendant Jenkins falsely accused Brishaber of refusing a patient assignment.

147.    On October 20, 2020, Defendant Jenkins falsely accused Brishaber of calling in sick to avoid taking care of patients.

148.    On October 20, 2020, Defendant Jenkins falsely accused Brishaber of insubordination by not assigning a CNA one-on-one attendant duty.

149. On October 20, 2020, prior to the start of her work shift, Brishaber followed company procedures for calling off work due to illness.

150. Jenkins knew that Brishaber called in sick.

151. Jenkins had no evidence upon which to base his false allegation that Brishaber had called in sick to avoid patient care or to avoid a patient assignment.

152. Jenkins knew all his allegations were false but published them anyway by reporting the false allegations to a third party, Leanne Howe, who in turn published them by writing the false allegations on the company's Employee Corrective Action Form and placing the same in Brishaber's personnel file for any third-party viewer to view.

153. Brishaber suffered damage to her professional reputation as a nurse and damage to her reputation within her local community.

154. Brishaber suffered damages resulting from Jenkins' false statements.

## COUNT IV.

### Defamation *Per Se* (Leanne Howe)

155. Brishaber incorporates by reference paragraphs 1 through 154 above as if stated fully herein.

156. Howe adopted the false allegations and repeated them by listing them on the Employee Corrective Action Form.

157. Howe knowingly and intentionally signed the Employee Corrective Action Form which contained the false allegations against Brishaber.

158. On October 20, 2020, Howe called Brishaber to inform her she was fired.

159. During the course of the phone conversation with Brishaber, Howe recounted all three of the false allegations against Brishaber.

160. Brishaber responded to Howe that she could not have refused a work assignment because she was not even at work on the day in question, that she had called in sick in accordance with company policy

161. Howe responded that she did not know that Brishaber had called in sick on October 17, 2020.

162. Nevertheless, Howe would not modify or rescind the false allegation that Brishaber had called in to avoid patient care and refused a work assignment.

163. Even after receiving Brishaber's rebuttal to Jenkins' false allegations, Howe told Brishaber she was still fired.

164. Brishaber suffered damage to her professional reputation as a nurse, embarrassment and humiliation because of Howe's defamatory allegations.

165. Brishaber suffered damages resulting from Howe's defamatory statements.

## **RELIEF**

**WHEREFORE,** Brishaber requests the Court grant judgment against Defendants for:

a. All consequential pecuniary losses, including but not limited to back pay, front pay;

b. Compensatory damages to be determined at trial;

c. Punitive damages, such damages to be determined at trial;

d. Reasonable attorney fees and costs;

e. Pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

f.  Injunctive relief to include an injunction against all Defendants prohibiting them from engaging in retaliatory conduct against Plaintiff which includes, but is not limited to, adverse work references to current or prospective employers, and,

g.  All other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Brishaber requests trial by jury on all issues so triable.

Respectfully Submitted,

*/s/ Tae Sture*
Tae Sture, Attorney No. 25120-29
Counsel for Plaintiff
Sture Legal Services LLC
155 E Market Street, Ste 700
Indianapolis, IN 46204
Ph:   (317) 577-9090
Fax:  (317) 577-1102
Email: tae@sturelaw.com